hMURRAY, Judge.
Afeo Credit Corporation (“Afeo”), an insurance premium finance company, appeals the dismissal of its claim against Rosenthal Agency, Inc. (“Rosenthal”) for $37,344.29 in unearned premiums allegedly due to it, plus interest and attorney fees.

FACTS

The case was tried to the court on March 16, 1995. The only testimony offered at trial was that of Ms. Leslie Rosenthal Jacobs, president of Rosenthal. Her deposition of February 20, 1990, was admitted as Exhibit P-2 and her affidavit dated November 29, 1991, was admitted as Exhibit P-1.
Stalter and Company, Ltd., AKA Stalter, Weise & Michel, Inc. (“Stalter”), was a Louisiana insurance brokerage firm which had sold some Lloyds of London insurance policies to American Offshore Fleet and to Intra-coastal Metals, Inc. Afeo paid the full premiums for each of these policies to Lloyds on behalf of the insureds, pursuant to its premium finance agreement with Stalter. However, inlaApril 1988, the policies for both American Offshore Fleet and Intracoastal Metals, Inc. were cancelled.[1] According to Ms. Jacobs, the general industry practice upon cancellation of such financed policies was that the unearned premium amount would be credited by the insurer in favor of the agent, who would in turn credit the premium finance company. At regular intervals, the agent and the finance company would balance credits against debits to determine how *1079 much money would change hands and in which direction.
In this case, Stalter’s books properly reflected cancellation of the policies at issue; the credit for Intracoastal Metals’ unearned premium was entered May 12, and American Offshore’s credit was entered May 16, 1988. The accounts thus reflected that Stalter owed Afeo for the refunded premiums, stipulated to total $37,344.29. However, on May 13, 1988, before the next date for balancing its accounts with Afeo, Stalter filed for bankruptcy. Afeo was listed as a creditor for $112,820.00, and Lowndes Lambert Corp., Ltd. (“Lowndes”), Lloyds’ broker, as a creditor for $326,170.93.
Prior to the bankruptcy filing, Rosenthal Agency, Inc., an unrelated insurance agent/broker, and Stalter had begun negotiations for a sale of Stalter’s “book of business.” Shortly after the bankruptcy filing, approval of the bankruptcy court was sought for an agreement reached between Stalter, Rosenthal and First National Bank of Commerce (“First NBC”), the assignee/pledgee of all of Stalter’s accounts receivable. A hearing was set for May 25,1988 to consider this agreement and any objections thereto. Notices were sent to all major creditors, including Afeo. While Afco’s parent company, Continental Insurance I3C0., was represented at this hearing, Afeo did not appear. By Judgment dated May 26, 1988, Stalter was authorized to proceed with the proposed contract, which was executed that same day.
Under the terms of the contract, styled as a “Sale of Assets”, Stalter transferred to Rosenthal certain furniture and equipment, all customer files and renewal rights and all customer accounts receivable for a total anticipated price of “approximately $750,000.” Additionally, Rosenthal assumed liability for specified customer accounts payable[2] and for Stalter’s secured debts to First NBC. The agreement stated quite clearly that Rosen-thal’s assumption of liability under the agreement was limited. In addition to a specification in Section II, paragraph 2 “that Purchaser assumes no liability for any credit balances that may be due from Sellers to any insured,” Section III, paragraph 3 provided that:
It is further understood by all parties that Purchaser assumes no liabilities of Sellers except for those recited herein and specifically shall not be liable for any liability of Sellers, among others, for 1) unpaid state premium taxes; 2) balances due to insureds; 3) errors or omissions of Sellers; and 4) Afeo Finance Corporation, regardless of whether such claim be by Afeo directly, or indirectly through another party by virtue of any transfer or assignment, subrogation, or if contained in or added to any insurance company account payable or through any other means. (Emphasis added.)
Ms. Jacobs personally handled this transaction, and had examined some of Stalter’s records in connection with the negotiations. She testified that this clause limiting the assumption of liability was included because Rosenthal knew it could not afford to cover Stalter’s debt to Afeo in addition to the amounts it would be paying to |4First NBC and to insurance brokers, such as Lowndes, with whom it had to maintain a good relationship.[3]
Prior to entering into the purchase agreement, Ms. Jacobs had discussed the proposal with Gerald Becker, a Lowndes’ representative who had come to town because of concern over the Stalter situation. Rosenthal had always done business with that firm “on a handshake” and never had a written contract. Mr. Becker assured Ms. Jacobs that they would have no objection to the proposed *1080 transfer of accounts as long as Lowndes was paid the net amount due from Stalter. Thus, they made a verbal agreement to balance Stalter’s debits and credits before determining the amount Rosenthal would have to pay in order to maintain a working relationship with Lowndes.
After Rosenthal effected the purchase, Stalter’s accountant and certain other employees remained for sixty days to close out accounts and transfer data to Rosenthal’s computer system. Stalter had received a “Credit Note” from Lowndes dated May 26, 1988 showing a “TOTAL NETT (sic) RETURN PREMIUM DUE” of $7,745.90 for an Intracoastal Metals’ policy, and applied that against the balance shown due to Lowndes on its Account Statement dated in June 1988. On July 19, 1988, Rosenthal received a fax from Lowndes showing the calculation of the return premiums due based upon cancellation of the American Offshore Fleet policies; credits totalling $36,434.06 were noted on a June 23, 1988 Lowndes’ Account Statement. After these credits were applied, Rosenthal closed out the | gStalter account with Lowndes by wire transfers of $1,244.66 on July 14, 1988 and $49,279.10 on August 16, 1988.[4]
Afeo filed this suit in August 1989, asserting that these unearned premiums belonged to them but had been “misdirected” to Ro-senthal Agency, Inc. Ms. Jacobs testified that the policies were cancelled prior to Stalter’s May 26, 1988, agreement with Ro-senthal. Since Rosenthal did not receive a refund from Lowndes for the unearned premiums at issue here, it was Rosenthal’s position that Stalter owed this money to Afeo, who should have asserted a claim in the bankruptcy action. Ms. Jacobs stated that when an Afeo-finaneed policy was cancelled after Rosenthal’s acquisition of the Stalter accounts, her firm did in fact pass the return premium on to Afeo even though there was no contractual duty to do so. She acknowledged that, in some few cases, Rosen-thal had made refunds to customers or other brokers for which they had no legal liability under the purchase agreement because it was decided that maintaining the goodwill of certain customers was important to then-success. However, since Rosenthal had never dealt with Afeo and did not anticipate doing so, Ms. Jacobs felt no obligation, legal or otherwise, to pay any portion of Stalter’s debt to that company. The trial court agreed with Rosenthal’s position, and rendered judgment against Afeo.

DISCUSSION

On appeal, Afeo first contends that it is entitled to judgment based upon Rosen-thal’s admissions at trial that Afeo “owns” the return premiums at issue. This claim is based upon Ms. Jacobs’ testimony that Stal-ter was merely a payment conduit between the insurer and the payor (either the insured or the premium | (finance company) for a returned premium. Ms. Jacobs also acknowledged that insurance agents have a fiduciary duty to make such refunds to the rightful party, and she further admitted that Rosenthal knew prior to its purchase that these return premiums were owed to Afeo. Afeo therefore argues that Rosenthal’s failure to remit the $37,344.29 to it amounts to conversion.
In relying upon its opponent’s “admissions,” Afeo misperceives Ms. Jacobs’ testimony. She acknowledged Rosenthal’s fiduciary duty to its customers and brokers, and assumed that Stalter had a similar obligation to Afeo, whether by contract or otherwise. And her “admission” that these credits were owed to Afeo was specifically and repeatedly qualified as a debt owed by Stalter, not Rosenthal: “Stalter and Company prior to us buying them took the credit, applied it against Lowndes Lambert’s account current and created a liability to Afeo. That was clearly identified on their balance sheet and in the bankruptcy hearings.” Therefore, this argument is without merit.
Afeo next argues that since it was the owner of these credits under Louisiana law, Stalter could not convey title to Rosenthal through the Sale of Assets executed by the parties. For the same reason, it contends that the bankruptcy court had no jurisdiction to dispose of this non-debtor property. Therefore, Afeo asserts this court must rec *1081 ognize its continued ownership of these credits by reversing the judgment below.
Afeo thus frames the issue in terms of ownership and conveyance of an item of property. However, no evidence was presented to suggest that a separate bank account or even a segregated sum of money existed and changed hands at any point of these transactions. Instead, Ms. Jacobs’ unequivocal testimony established 17that on April 18, 1988,[5] when the policies for both Intracoastal Metals and American Offshore Fleet had been cancelled, Afeo was owed $37,844.29 (the stipulated amount). Although the refund was owed by Lloyds of London through its agent, Lowndes, Afco’s standard financing contract[6] provided that Afeo could look to Stalter for payment of this returned premium. Accordingly, Stalter had entered a credit on its books in favor of Afeo; it is this credit which Afeo claims has been' “taken” from it.
A “credit” is defined in part as “[t]he correlative of a debt; that is, a debt considered from the creditor’s standpoint, or that which is incoming or due to one.” Black’s Law Dictionary 331 (5th ed. 1979). Despite Afco’s arguments to the contrary, since it has not received the money at issue, it still owns this credit. Thus, the issue here is not whether Rosenthal was legally justified in “taking” Afco’s credit, but whether Afeo has established a basis on which to hold Rosen-thal liable for payment of the debt owed to Afeo. Since Rosenthal had no prior relationship with Afeo, its liability for this debt could only arise from its written contract with Stal-ter or its oral agreement with Lowndes.
The Sale of Assets executed May 26, 1988 made no transfer of Afco’s property to Ro-senthal, but provided only that Rosenthal acquired some of Stalter’s assets in exchange for the assumption of certain specified debts. In that agreement, Rosenthal specifically excluded any liability to Afeo. Afeo had notice |gof this provision and the opportunity to voice an objection, but chose not to do so. Therefore, this contract provides no basis for Afco’s claim in this suit.
Similarly, the agreement between Lowndes and Rosenthal has not been shown to have had any effect on Afco’s rights. The evidence suggests that Lowndes agreed to accept $50,523.76[7] from Rosenthal as payment in full for Stalter’s debt, and that this figure was determined in part by the fact that Lowndes had not previously paid the return premiums at issue here to anyone else. However, there is absolutely nothing in this record to establish that Afeo has sought, much less been denied, recovery of this debt from either of the two firms that were parties to the original transaction, Lloyds of London and Lowndes. Thus, Afeo has not shown that Rosenthal’s agreement with Lowndes resulted in any loss for which liability could be imposed here.
Therefore, while we agree that neither Stalter nor the bankruptcy court could convey Afco’s credit to Rosenthal, we find that no such transfer has occurred.[8] Rosenthal concedes, and the trial court found, that Afeo is still owed a refund for the cancelled policies at issue. However, having failed to object to Rosenthal’s express rejection of liability, Afeo has not established any basis for recovery in this suit. The judgment below is affirmed at plaintiffs cost.
AFFIRMED.

. The policies for Intracoastal Metals were can-celled effective April 11th; those for American Offshore Fleet were cancelled effective April 18, 1988.

. The Agreement indicates that the Customer Accounts Payable being assumed by Rosenthal is “itemized, on the attached Exhibit 'B' ”, but that attachment is not included anywhere in this record. The evidence presented here gives rise to the inference that Lowndes was among those creditors Rosenthal agreed to pay.

. According to the agreement at issue here, Stal-ter's principals acknowledged that "(a) substantial portion of (Stalter’s) debts are represented by sums owed to insurance companies for premiums collected by (Stalter) but not remitted, ... It is acknowledged to be of vital importance to all Sellers that accounts payable to the insurers be liquidated as they become due.” It is therefore clear that even Rosenthal’s limited assumption of some of Stalter’s liabilities prevented loss of insurance coverage to Stalter’s clients.

. The data summarized in this paragraph is from Exhibit P-3, an assortment of business records from Rosenthal’s files.

. Ms. Jacobs stated that under the insurance industry’s custom and practice, any credit due for an unearned or return premium was effective on the date of cancellation.

. Under this form contract, Stalter agreed "to hold in trust for Afeo any payments made or credited to the insured through or to the undersigned, directly, indirectly, actually or constructively by any of the insurance companies and to pay the monies to Afeo upon demand ... and that any lien the (agent) now has or hereafter may acquire on any return premium arising out of the above listed insurance policies is subordinated to Afco’s lien or security interest therein;

. The testimony was not clear whether the records admitted as Exhibit P-3 included all transactions regarding former Stalter accounts with Lowndes, or only those reflecting an entry related to the return premiums at issue here.

. Because of this holding, we need not discuss Afco’s cited jurisprudence regarding constructive trusts.